[L. A. No. 2065. Department Two.—February 10, 1908.]

In the Matter of the Estate of LUTELLUS DOOLITTLE, Deceased. WILLIAM S. DOOLITTLE and ALVIRA MARLING, Contestants of Will, Respondents, v. L. D. DAVENPORT, Proponent of Will, Appellant.

WILLS—CONTEST OF PROBATE — CONFLICTING EVIDENCE — SUPPORT OF FINDING.—The rule that a verdict or finding will not be disturbed upon appeal where there is a real and substantial conflict of evidence on the issue of facts involved applies to litigation over the validity of wills, as well as to any other kind of litigation. Upon a contest of the probate of a will, where, notwithstanding conflicting evidence, there was sufficient evidence and circumstances in proof to sustain the court in finding that when the will was made the deceased was of unsound mind and incapable of making a will, and that the proposed will was not his will, such finding cannot be disturbed.

ID. — ORDER DENYING NEW TRIAL — NEWLY DISCOVERED EVIDENCE — CUMULATIVE PROOF.—Where a new trial for newly discovered evidence is denied the order will be sustained, independently of the question of laches, where the affidavits are of little importance or are merely cumulative.

APPEAL from an order of the Superior Court of Los Angeles County denying a new trial. Curtis D. Wilbur, Judge.

The facts are stated in the opinion of the court.

Gavin W. Craig, and Frank C. Vaughn, for Appellant.

Frank James, for Respondents.

McFARLAND, J.—This appeal arises out of a contest over the probate of the alleged will of Lutellus Doolittle, deceased. The proponent is L. D. Davenport, who is the main beneficiary in the will and named therein as executor. The contestants are a brother and sister of the deceased. The case was tried without a jury, and the court found that at the time of the making of the alleged will the deceased was of unsound mind and incapable, from such unsoundness of mind, of making a will, and that the alleged will is not his will; and judgment was entered denying the probate.

The proponent made a motion for a new trial, which was denied, and from the order denying the motion he appeals.

Appellant makes two points for a reversal, 1. That the evidence was not sufficient to justify the finding that the deceased was not of sound mind, and, 2. That a new trial should be granted on account of newly discovered evidence.

1. This court has a number of times set aside verdicts upsetting wills in cases where there was ample proof of the validity of the will in question, and what was claimed to be conflicting evidence was mere pretense and without material and substantial value. But, of course, the rule that a verdict or finding will not be disturbed where there is a real and substantial conflict of evidence on the issue of fact involved, applies to litigation over the validity of wills as well as any other kind of litigation; and, in our opinion, this rule as to conflicting evidence applies to the case at bar and to the finding that the deceased was of unsound mind and incapable of making a will at the time of the alleged making of the will here in question. We will not notice in much detail the evidence on which the finding is based, but will notice only a few leading circumstances. The document in question was signed by the deceased, by making his mark, at the hospital of the National Soldiers' Home of Los Angeles County, about ten o'clock A. M. of February 26, 1905. He had been in the hospital several days suffering from an attack of acute pneumonia, which caused his death. He was in an exceedingly weak and feeble condition physically. One of appellant's witnesses says: "I saw Mr. Doolittle make his mark. He tried to write his name but could not do it. He was weak and could not sit up straight in bed." The evidence shows that he was evidently about as weak and feeble physically

as a man can well be and still live.  He was dying at the time
of the alleged making of the will.  Dr. Parker, a subscribing
witness, and a witness for appellant at the trial, speaking of
the condition of the deceased at the time of the making of
the will, said:  "He was a dying man, of course."  And he
died within an hour thereafter.  Of course, a man may be
extremely weak and feeble physically, and may be in a
dying condition, and yet retain his mental faculties and will
power to such an extent as to enable him to make a valid will;
but such a feeble and dying condition is entitled to consider-
ation in determining his mental capacity, and is of marked
significance when there is also evidence tending directly to
show his feeble mental condition.  There is evidence that he
was, part of the time at least, in a state of dumbness and
deep stupor.  He died in a cot in the hospital surrounded
by other cots in close proximity occupied by other patients.
About seven o'clock in the morning, an hour or two before
the making of the will, one of the attendants at the hospital
brought the deceased his breakfast and spoke to him, but
could not get any answer.  "He appeared to be asleep and
drowsy."  He did not eat anything.  Afterwards at about
10:30 o'clock he again asked the deceased if he wanted to
eat anything, but could get no answer.  Dr. Parker, appel-
lant's witness, speaking of the time of the making of the will,
says:  "He was very sick, slightly drowsy, but *when aroused*
and spoken to he answered clearly and rationally. . . . He
could speak but with some difficulty."  There was other
evidence pointing in the same direction.  Moreover, the will
was written by the appellant and there was a sharp conflict
of evidence as to whether the deceased was a moving party
in having the will made, whether he dictated it to the appel-
lant or whether the latter first read the various paragraphs
and then asked the deceased if it was what he wanted.  When
appellant came to the cot of the deceased to write the will,
he asked one Griffith to be a subscribing witness, and to take
notice "of what was going on there that morning."  The
witness said "my bed was right there and I sat down and
listened to the whole business."  When asked "if Mr. Doo-
little gave the substance of the will to Davenport as he wrote
it," he answered, "Well, no, I could not say that."  Again
he said, "I did not hear Mr. Doolittle say anything that

morning that I remember of besides asking Mr. Davenport
to read one part of the will over again. I didn't hear him
give any directions at all as to whom he wished to dispose
of his property." The witness Wallingford testified that he
was present when the will was drawn. He testified that
appellant "would read a little ways and ask him if that was
satisfactory to him, and he would say, yes, it is right."

Q. "Did it happen like this, that Davenport would read a
little and ask Doolittle if that was satisfactory to him, and
Doolittle would say yes?"

A. "Well, that was just the way it was."

The appellant testified that on the morning when the will was
made he went to the ward where the deceased was, at the re-
quest of a Dr. Hasset, who had informed him that Doolittle
wanted to settle up his affairs. He testified that when he went
to the cot occupied by Doolittle he said "Good morning," and
Doolittle replied, "They say I can't get well. Do you think
so, Mr. Davenport?" Davenport replied that he was afraid
it was so. Doolittle, according to Davenport's testimony, then
said that he wanted his affairs settled, saying nothing, how-
ever, about a will, and Davenport told him it would be neces-
sary for him to make a written will. But another witness,
Barth, testified that upon that morning he saw Davenport
coming into the ward; that he went to Doolittle's cot and
said, "Hello, Dooley, you remember me?" There was other
evidence, some of which is hereinbefore referred to, tending
to show that the appellant, and not Doolittle, was the moving
party in having the will made. Indeed, it is highly probable
that if the deceased had not been "roused and spoken to,"
and the making of the will pressed upon him, it never would
have been made. The fact is significant—outside of the
question of undue influence, which is not raised here—for,
if the purpose of making the will had originated with the
deceased, and he had, of his own motion, carried that purpose
into effect, those facts would have been important evidence
to the point that, notwithstanding his feeble and dying condi-
tion, he still had the will power and the mental capacity to
make the will. But if he was merely the passive, half con-
scious assenter to the dictation of another person, that fact
would be consistent with and corroborative of the want of
testamentary capacity found by the court. There are other

facts and circumstances urged by respondents in support of the judgment which we will not discuss. The evidence and circumstances referred to are sufficient to support the finding excepted to; and there is no warrant for us to hold that, notwithstanding that evidence and the peculiar circumstances surrounding the alleged making of the will, the court *should have found the other way.*

2. As to the ground of newly discovered evidence, it is sufficient to say that, waiving the question of laches, the affidavits offered are either of little importance, or are merely cumulative.

The order appealed from is affirmed.

Henshaw, J., and Lorigan, J., concurred.